(128 App. Div. 655.)

SCHOONMAKER et al. v. HENRY STEERS, Inc.

(Supreme Court, Appellate Division, Third Department.    November 11, 1908.)

1. SHIPPING (§ 54*) — CHARTERS—LOSS OF VESSEL—LIABILITY OF CHARTERER—BAILMENT.

Where a charter party contemplated that a barge, while in the charterer's service, should be under the management and control of a captain selected by the owner, the relative liability of the owner and of the charterer for loss of the vessel was not that of bailor and bailee.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

2. SHIPPING (§ 58*) — CHARTERS — LOSS OF VESSEL — ACTIONS — QUESTION FOR JURY.

Where a charter party contemplated that a barge hired to carry river excavations should be under the management of the owner's captain, who should superintend its loading by dumpers, in an action by the owner to recover from the charterer for loss of the barge, caused by overloading in the captain's absence, whether the charterer's agent notified the owner's manager over the phone of the captain's absence, and the manager promised to attend to the matter, *held* to be for the jury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 243; Dec. Dig. § 58.*]

3. SHIPPING (§ 54*)—CHARTERER'S LOSS OF VESSEL—LIABILITY OF CHARTERER.

While the barge was in general charge of the captain, it was also in a sense in the charterer's charge, and if it knew that the captain had abandoned his duty, and that the continued loading in his absence was liable to injure the boat, it violated its duty to the owner.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

4. SHIPPING (§ 58*)—CHARTERS—LOSS OF VESSEL—ACTION—QUESTION FOR JURY.

Where a barge was chartered to carry river excavations, and the owner's captain had supervision of the loading, and in his absence the barge was sunk by overloading, in an action against the charterer to recover its value, if the owner was not notified by the charterer of the captain's absence, and did not promise to attend to the matter, whether the charterer, in allowing the loading to be continued during the captain's absence, violated any duty to the owners with knowledge that the captain was not properly attending to his duties, and whether the owners knew or had reason to believe that the captain was neglecting his duties, and took no precaution to protect the boat, *held* for the jury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 243; Dec. Dig. § 58.*]

Smith, P. J., dissenting.

Appeal from Trial Term, Ulster County.

Action by John D. Schoonmaker and another, copartners, against Henry Steers, Incorporated. Judgment of nonsuit, and plaintiffs appeal. Reversed, and new trial granted.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

Martin A. Ryan, for appellants.
Charles Thaddeus Terry (Edward Ward McMahon, on the brief), for respondent.

JOHN M. KELLOGG, J. The plaintiffs' barge sank at the dock at Long Island City while under a charter party to the defendant, and they bring this action to recover the value thereof. By the charter party defendant was to pay $10 per day for the use of the boat "to January 1, 1907, in carrying tunnel excavations in New York Harbor and all adjacent waters." It further provided:

"One man, to act as captain, is furnished and paid by the owners."

The plaintiffs had hired out various other boats for similar service, and five other of their barges were under charter to the defendant for such work. They had been furnishing boats for such service for two years for the predecessors of the defendant on its contracts, which were performed in substantially the same manner. The kind of work and the manner of doing it was evidently understood by both parties. Upon September 1st plaintiffs put a new captain upon this barge, and he proved to be a drunken, incompetent man, although they claim he was well recommended to them. It is a disputed question whether the defendants, prior to the accident, notified the plaintiffs of the incompetency of the captain.

It was the duty of a captain of a barge engaged in this work to take care of the interests of the owner, to see that proper lines were upon the boat, to see that she was not overloaded, and to change the boat from time to time in the slip, and to direct the dumpers where to place the load, and to notify them when to stop on account of the boat being loaded. While a boat was loading it was necessary to change her position from time to time so that the load may be evenly distributed, and to tighten and loosen her lines. It was the duty of Breslin, an employé of the defendant, to put the empty boats under the dump, so that they could be loaded. He then went away, leaving the boat in charge of the captain. The load was dumped upon her by the employés of other contractors. The defendant's connection with the business of carrying tunnel excavations consisted in bringing the boat up to the dump and putting her in position. The captain then took charge of her, and saw that the load was properly placed upon her by the other contractors, and changed her position from time to time as necessary. When filled, the captain notified the dumpers, and the boat was removed by the defendant's tug. September 5th the boat was placed under the dump by Breslin, and the captain moored her to the dock, and the other contractors began to load her. At 10 o'clock in the morning of September 7th Breslin discovered that the captain was absent from the boat and the cabin locked. He returned at 2 o'clock and found him still absent. He then telephoned to Stavy, the manager of the defendant, that the captain was off the boat. Stavy swears that he immediately called the plaintiff's office on the phone,

and notified Connors, their manager, that the captain was off the boat and that he should attend to it. He said he would attend to it. Conners was recalled by the plaintiffs and was asked this question:

"Q. Mr. Stavy, one of the witnesses here, testified that he called up the office of Schoonmaker & Rice and had a conversation with you about the absence of the captain on September 7th. Did such a conversation take place? A. I have no recollection of any conversation with Mr. Stavy on the 7th."

Otherwise there was no denial of the evidence of Stavy upon that subject. Breslin, about 4 p. m., again visited the boat and found it in the same condition, without a captain, but in good order and about half loaded. No further attention seems to have been paid to the boat by either the plaintiffs or defendant. She sank about 12 o'clock that night. Ten or fifteen minutes before, she seemed to be in good condition, and nothing wrong was discovered about her. The captain returned to the boat about 5:30 the morning of the 8th, in a drunken condition. Nothing appears of his whereabouts the 7th, except he was seen about 6 o'clock in the morning at the corner of Thirty-Fourth street and First avenue, New York, looking for a drink in a saloon and borrowed the car fare to go to the office to get his money. He was at the plaintiffs' office in New York about noon, and was paid $5, which was not all the money due him, about 4 o'clock. He reported the boat all right, and said he was going back to it.

The evidence tends to show that the loss of the boat was probably due to the fact that the other contractors, whose duty it was to dump into the boat, continued the dumping in the absence of the captain, probably without knowledge of his absence, and by her position not being changed she became overloaded upon one side, which caused her to list, and by crowding against the pier in the rising tide she was broken and collapsed, so that the real cause of her loss is undoubtedly the incompetency of the captain and his abandoning his duty and leaving the boat subject to the injury which happened to her. I cannot agree with the plaintiffs that the liability of the parties here is that of bailor and bailee, and that it rests with the defendant to account for the injury, for the reason that the charter party contemplated that the boat, while in the service of the defendant, should be under the management and control of a captain selected by the plaintiffs, and if any inference is to be indulged in it would more naturally follow that the injury came from the incompetence or negligence of such captain. So far as the doctrine of res ipsa loquitur applies, it points towards the plaintiffs and their captain. The boat, in a way, was in the defendant's charge. It knew that the plaintiffs had placed over her an incompetent captain, and it knew at 10 o'clock, at 2 o'clock, and at 4 o'clock on the day of the accident that the captain was not on the boat. Plaintiffs also knew that at noon and 4 o'clock the captain was in New York. The absence of the captain at noon and 4 o'clock did not necessarily show that he was not performing his duties, because if he had his work well in hand, and knew the condition of the boat and the amount of dumping going on at the time, his absence at those periods possibly was not conclusive that he was not in the performance of his duties as captain. The

question arises: Did the defendant know that the captain had abandoned the boat without plaintiffs' knowledge, and did it permit the dumping to continue without any effort to notify the plaintiffs, or to save the plaintiffs' property in its charge under the captain from unnecessary loss? If the defendant notified the plaintiffs of the absence of the captain, and they agreed to supply the place, probably a person of ordinary care placed in the defendant's position would have relied upon the fact that he would be replaced immediately, and would not have thought it necessary to order a suspension of the work. But it is in a way disputed whether such a conversation took place, and, while the denial is very weak, it is perhaps a question for a jury to determine whether the conversation took place.

If no such conversation took place, it then becomes a question of fact whether the defendant had reason to believe that the captain would not return to his duties when they were reasonably required, and whether an injury to the boat was liable to occur during his continued absence. While the boat was in the general charge of the captain, it was also in a sense in the charge of the defendant, and if it knew that the captain had abandoned his duty, and that the continued loading of the boat in his absence was liable to bring injury to the boat, it may be considered as having violated its duty to the plaintiffs. If the plaintiffs had reason to believe, from the presence of the captain in New York at their office at the time they paid him a part only of the moneys due him, that he was drinking or neglecting his duty, and took no means to protect their property, they cannot seriously complain of the defendant because it did not take means to guard them against losses which they were not willing to protect themselves against. Perhaps a man of ordinary prudence, finding the captain absent at the particular times that Breslin called at the boat, but still finding the boat in good condition, would be warranted in assuming that the captain was still in charge of the boat, was near, or so near that he would give it attention when required, and as the loading of the boat at that time had not been improperly made, and no injury had resulted from his absence, perhaps Breslin was justified in thinking that the captain, in the performance of his duties, would return before any injury could happen to the boat. He may have thought the captain was timing his absence when the condition of the loading was such that no injury would follow. He perhaps thought the captain knew more about that business than he did.

It is manifest that the plaintiffs were either careless in leaving the boat without a captain, or felt that certain absences of the captain from the boat were not material, and that injury was not liable to occur therefrom, and were willing to assume the risk of such an absence. Were the absences and the conditions existing such that the defendant, or the plaintiffs, or both, were chargeable with knowledge that the captain was neglecting his duty and had practically abandoned the boat, and that loss might come to the plaintiff therefrom? If the facts were equally known to both, the defendant might well assume that the plaintiffs deemed it prudent to manage their boat in their own way, and were perhaps not called upon to interfere therewith. The negligence of the captain and his continued absence is

chargeable to the plaintiffs; but nevertheless, if they did not know the facts and the defendant did, it was not justified in recklessly and negligently permitting the other contractors to load the boat, if the loading in the absence of the captain would probably bring about an injury to the boat.

These considerations, and probably others, bear directly upon the question of fact whether the defendant violated any duty which it owed to the plaintiffs with reference to the boat, with a knowledge that the captain was not attending properly to his duties, and whether the plaintiffs knew or had reason to believe that the captain was neglecting his duties, and took no precaution to protect the boat. It may be that, conceding the incompetence of the captain, if the defendant knew or had reason to know that he had abandoned the boat, and the plaintiffs had not such knowledge or reason to believe, a jury might find that the defendant, knowing the situation, recklessly or negligently permitted the loading to continue to the injury of the plaintiffs. The fact that the plaintiffs, through their captain, had negligently left their boat in a condition where it was liable to suffer injury, did not justify the defendant, if it knew the fact and that injury was liable to follow from the continuous loading of the boat, thus willfully to permit an injury to the plaintiffs' property. After the jury pass upon the question, it then becomes a fair question for the consideration and action of the court.

The judgment should therefore be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, except SMITH, P. J., who dissents.